UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| TERESA J. CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:09-cv-0965-SEB-TAB |
| vs. | ) | |
| | ) | |
| MICHAEL J. ASTRUE,  Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY

Teresa Campbell seeks judicial review of the denial by the Commissioner of the

Social Security Administration ("Commissioner") of her application for Disability

Insurance Benefits ("DIB") under the Social Security Act (the "Act"), 42 U.S.C. § 301, et

seq.  For the reasons explained in this Entry, the Commissioner's decision must be

REMANDED.

### *Background*

Campbell initially applied for DIB on September 9, 2004, alleging an onset of

disability of April 20, 2004.  Her application was denied initially and again upon

reconsideration.  Her request for a hearing before an Administrative Law Judge ("ALJ")

was granted, and a hearing was conducted on October 16, 2007.  Campbell appeared,

accompanied by her attorney, James E. Davis.  Medical and other evidence was

introduced at the hearing.  Campbell and a vocational expert ("VE"), Stephanie R.

Archer, testified at the hearing.  The ALJ issued a decision denying benefits on November

16, 2007, and the Appeals Council denied review, making the ALJ's decision final.  See

Getch v. Astrue, 539 F.3d 473, 480 (7th Cir. 2008). This action for judicial review of the

ALJ's decision followed.  The Court has jurisdiction over this action pursuant to 42

U.S.C. § 405(g), which provides that "[a]ny individual, after any final decision of the

Commissioner of Social Security made after a hearing to which he was a party,

irrespective of the amount in controversy, may obtain a review of such decision by a civil

action . . . in [a] district court of the United States."

The ALJ concluded that Campbell was not disabled based on the following

findings: (1) Campbell met the insured status requirements of the Act through December

31, 2007; (2) Campbell had not engaged in substantial gainful activity since April 30,

2004, the alleged onset date; (3) Campbell had "severe" impairments consisting of

fibromyalgia, lumbar degenerative disc disease, and obstructive sleep apnea; (4)

Campbell did not have an impairment or combination of impairments that met or

medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1; (5) Campbell had the residual functional capacity ("RFC") to perform "light

work," as defined in 20 C.F.R. 404.1529 and SSRs 96-4p and 96-7p, providing that she

can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds.

Campbell is able to sit, stand and/or walk for six hours of an eight hour work day.  She

can push and/or pull objects weighing twenty pounds or less and may occasionally bend,

squat, kneel, stoop, and crawl.  Furthermore, Campbell should avoid repeated forceful

gripping with either hand and should not use vibrating tools; and (6) Campbell is capable of performing her past relevant work as a dry cleaner's store manager and presser even with the limitations provided by Campbell's RFC.  With these findings in hand, and through the application of applicable rules and regulations, the ALJ concluded that Campbell had not been under a disability as defined in the Act from April 30, 2004, through the date of the ALJ's decision.

### *Discussion*

## I.  Applicable Law

To be eligible for DIB, a claimant must prove that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  To establish disability, Campbell is required to present medical evidence of an impairment that results "from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."  20 C.F.R. §§ 416.908; 404.1508.

A five-step inquiry outlined in the Social Security regulations is applied to determine disability status.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 351-52 (7th Cir. 2005).

3

The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves her unable to perform her past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.  20 C.F.R. §§ 404.1520, 416.920.  A finding of disability requires an affirmative answer at either step three or step five.

Id.  The claimant bears the burden of proof at steps one through four, and at step five the burden shifts to the Commissioner.  Id. at 352.

The task a court faces in a case such as this is not to undertake a *de novo* determination of Campbell's entitlement to benefits, but to decide if the Commissioner's decision was supported by substantial evidence and is otherwise free of legal error. Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993).  "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938)).

## II. Analysis

In this case, the ALJ determined that Campbell had "severe" impairments consisting of fibromyalgia, lumbar degenerative disc disease, and obstructive sleep apnea, but that she had the capacity to perform "light work" with certain limitations. Campbell argues that the ALJ's decision was not supported by substantial evidence. Specifically, Campbell contends that the ALJ erred in evaluating the opinion of Campbell's treating physician, erred in his determination of Campbell's credibility, and erred by not giving adequate consideration to the third party statements made by Campbell's husband and daughter regarding her physical limitations. (Pl.'s Br. 3, 4.) Campbell asserts that, because of theses errors, the ALJ's RFC assessment overstated her ability to perform work related tasks. (Id. at 4.)

### *Mrs. Campbell's Medical History*:

Campbell's medical record shows that on August 30, 2004, her family practitioner, Dr. Ray Haas, diagnosed Campbell as suffering from fibromyalgia. (R. at 235.) On October 20, 2004, at the request of the SSA, Campbell was examined by Dr. Wail Bakdash. (R. at 196.) Dr. Bakdash reported tender points on Campbell's back and also diagnosed fibromyalgia, but did not restrict Campbell's physical activity in any way. (Id.) On October 21, 2004, upon the referral of Dr. Haas, Campbell met with rheumatologist Dr. Steven Neucks. Dr. Neucks also reported tender points, and diagnosed fibromyalgia as the basis for Campbell's "all over" pain as well as trochanteric

bursitis, which he noted may have also "aggravated and/or generated" some of her pain. (R. at 154.)  In a May 31, 2005 meeting with Dr. Neucks, Campbell reported doing better.[1]  (R. at 370.)  However, during subsequent appointments with Dr. Neucks, including one on July 19, 2005, she reported that the pain in her neck, legs and feet had recurred.  On September 22, 2005, she again reported "pain all over."  (R. at 367, 361.) From December 2005 to June 2006, Neucks's medical reports reflected periods of improvement followed by periods of pain and discomfort.  (R. at 341, 349, 354.)  On October 18, 2006, Dr. Neucks prescribed physical therapy.  On November 8, 2006, Campbell's physical therapy report notes that she presented the following problems that warranted physical and/or occupational therapy:

> [d]ecreased ROM, decreased soft tissue mobility, decreased joint
> mobility, decreased lumbar stability, decreased scapular stability,
> decreased strength, joint pain, neural symptoms, painful ROM,
> tenderness with palpation, soft tissue pain, decreased ADL function.

(R. at 415.)  Following a series of physical therapy sessions in which Campbell had reported improvements,[2] she was discharged from therapy on December 21, 2006. (R. at 396.)  The physical therapy report on the day she was discharged noted "[d]ecreased tolerance to prolonged ambulation due to pain/difficulty" as well as decreased tolerance for sitting and standing, decreased lifting ability, and interrupted sleep.  (R. at 395.)  The

---

[1]On April 5, 2005, Campbell began taking Avinza, which was prescribed by Dr. Neucks, which she continued taking up to the time of the October 2007 hearing date.

[2]Campbell reported improvements during physical therapy sessions on November 27, November 29, December 6, and December 12, 2006.  (R. at 404, 401, 399-400, 398-99.)

same day, Campbell reported that her level of pain at its best was a three on a scale of ten, and her level of pain at its worst was a ten on a scale of ten.  (Id.)

Campbell continued to see Dr. Neucks regularly following her physical therapy sessions.  On January 18, 2007, and April 5, 2007, Campbell reported that she continued to experience pain in her lower back, hips, and both feet.  (R. at 321.)   In February 2007, x-rays were taken of Campbell's spine showing "[m]ild-to-moderate multilevel degenerative disc disease."  (R. at 317.)  On April 10, 2007, Campbell received an MRI of her spine which showed "mild to moderate facet degenerative change and ligamentous thickening."  (R. at 387.)  She also received an MRI of her left knee, which revealed a "[l]arge horizontal tear of the posterior horn and body of the medial meniscus" as well as an "[o]steochondral lesion in the posterior, nonweightbearing surface of the medial femoral condyle."  (R. at 390.)

On October 6, 2007, Dr. Neucks completed a fibromyalgia RFC questionnaire on Campbell reporting that she could sit for only thirty minutes at one time and stand for only ten minutes at one time.  (R. at 454.)  He further stated she can sit, stand and/or walk for at most four hours out of an eight hour workday and that she would be absent from work four days out of each month on average.  (R. at 455.)  A letter written by Dr. Neucks at the request of Campbell's counsel recounts that his clinical findings have "documented the presence of sleep apnea, restless leg syndrome, significant problems with cognitive function . . . a herniated disk, degenerative spondylosis, and a tear in the cartilage of the medial meniscus."  (R. at 449.)  He further stated that Campbell "has a

7

substantial impairment related to these problems . . . [s]he has gradually required more and more medication . . . [and] currently is on large doses of narcotics, which reflect the intensity of her symptoms." (Id.)  Based on these findings, Dr. Neucks opined that it is not possible for Campbell to be gainfully employed at even a sedentary level.  (R. at 451.)

The record also indicates that Campbell received psychiatric evaluations in 2004 and 2006, which generated mixed results.  In 2004, Dr. Gover examined Campbell at the SSA's request.  (R. at 192.)  During that examination Campbell complained of memory loss.  (Id.)  The examination revealed conflicting signals, however, regarding the extent of Campbell's cognitive impairments.  She was able to recall three out of three objects immediately, but could only recall two out of three objects after a five-minute break.  (R. at 193.)  Moreover, she was able to answer four simple arithmetic problems correctly, but answered that 12 plus 19 equaled 37 (instead of 31).  (R. at 194.)  In 2006, Campbell received further psychiatric evaluation by counselor A. Baker who reported that Campbell's thought process and thought content were normal.  (R. at 426-29.)

***ALJ's Assessment of the Weight of Medical Opinions***:

Campbell first contends that the ALJ erred by not evaluating the opinion of her treating physician, Dr. Neucks, in accordance with 20 C.F.R. § 404.1527(d), after the ALJ decided not to give Dr. Neucks's opinion controlling weight.  (Pl.'s Br. 11.)  According to the statute, all medical opinions of treating physicians that are not given controlling weight are supposed to include consideration of six factors: 1) The length of the treatment

relationship and the frequency of examination; 2) The nature and extent of the treatment relationship; 3) Supportability; 4) Consistency; 5) Specialization; and 6) other factors.  20 C.F.R. § 404.1527(d).  Campbell argues that the ALJ failed to credit the fact that Dr. Neucks had seen her 17 times over the course of almost three years.  (Id.)  Campbell also contends that the ALJ failed to take proper account of the fact that Dr. Neucks is a rheumatologist, the medical specialist best qualified to evaluate fibromyalgia.  (Id. at 12.) Moreover, Campbell argues that the ALJ erred in his finding that Dr. Neucks's opinion was not supported by objective medical evidence because in fact there are no objective medical tests to establish the presence of fibromyalgia.  Furthermore, Dr. Neucks's opinion was consistent with the medical opinions of other evaluating physicians who also had diagnosed Campbell with fibromyalgia.  (Id.)

The ALJ stated in his decision that he "assigned great weight to the opinions of State Agency medical consultants," who had concluded that Campbell had the ability to perform a reduced range of medium work activities. (R. at 21.)  The ALJ further stated that the treating physician's opinion "is not entitled to controlling weight as it is highly inconsistent with the objective evidence of record." (Id.)  However, the ALJ did not cite the specific opinions or findings of the State Agency medical consultants that he weighed more heavily than Dr. Neucks's opinion.  Furthermore, the State Agency medical reports to which the ALJ "assigned great weight" relate to 2004 evaluations, despite the fact that Campbell's symptoms persisted thereafter up to the time of the hearing in 2007.  (R. at 171.)

9

The Seventh Circuit has held that if well-supported evidence is introduced that contradicts the opinion of a treating physician, even if it is that of non-treating, non-examining physicians, then the treating physician's opinion is not controlling and is just one more piece of evidence to consider.  <u>Hofslien v. Barnhart</u>, 439 F.3d 375, 377 (7th Cir. 2006).  In this case, however, the evidence relied upon by the ALJ was seriously outdated, and as such, did not justify a conclusion contrary to the opinion of the treating physician.  The ALJ's view that Dr. Neucks's opinion is "highly inconsistent with the objective evidence" of the record (R. at 21) is of questionable merit when the only objective evidence cited in the record consisted of a polysomnogram, an x-ray, and two MRI's.  Moreover, the results of the x-ray and the two MRI's objectively showed physical impairments that would likely cause pain consistent with the pain Campbell claimed to experience.  The ALJ also noted that, in Dr. Neucks's opinion, Campbell suffered from "severe obstructive sleep apnea" (R. at 21),  when, in fact, a polysomnogram revealed only "moderate" sleep apnea.  (R. at 141.)  However, the polysomnogram report actually revealed "evidence of obstructive sleep apnea, severe during REM sleep."  (R. at 146.)  Therefore, Dr. Neucks's opinion does not appear to be "highly inconsistent" with the test results as the ALJ concluded.

The ALJ also identified inconsistencies between Dr. Neucks's opinion and Campbell's psychiatric evaluations.  Dr. Neucks stated that Campbell had "cognitive impairments which make even sedentary jobs difficult." (R. at 451.)  The ALJ appears to have considered *only* the psychiatric evaluation conducted in 2006 in concluding that

there was no evidence in the record to support a finding that Campbell's mental impairment causes anything more than "mild" limitation. (R. at 19.)  The ALJ thus failed to consider the 2004 evaluation conducted by Dr. Gover that showed Campbell was susceptible to episodes of mental impairment and memory loss.  (R. at 194). Furthermore, it is worth noting that Campbell is not arguing that she suffers from severe mental impairment.  Campbell's mental impairment was simply one of several impairments included in Dr. Neucks's report based on Campbell's complaints and Dr. Gover's psychiatric evaluation.  The fact that one psychiatric evaluation found no mental impairment is not a sufficient basis on which to discount the entirety of the medical opinion rendered by the treating physician whose experience with the patient extended over nearly three years.

Furthermore, the ALJ seemingly ignored the fact that Dr. Neucks continued to treat Campbell for nearly three additional years after she had filed for DIB, during which period he saw Campbell a total of seventeen times.  The Commissioner also failed to re-evaluate Campbell's condition after November 24, 2004.  (R. at 171.)  Thus, it appears that the ALJ erred by failing to give proper credit to the length of the treatment relationship and the frequency of examinations in assessing the weight to be applied to Dr. Neucks's medical opinion, as required under 20 C.F.R. § 404.1527(d).  Moreover, the ALJ did not reference the fact that Dr. Neucks is a rheumatologist, the most qualified medical specialist to determine the extent of a patient's fibromyalgia.  See Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996)("Fibromyalgia is a rheumatic disease, and the

relevant specialist is a rheumatologist.")  Thus, Dr. Neucks's expert medical opinion on Campbell's *physical* impairments should not have been discounted based on subjective evidence that merely conflicts with Dr. Neucks's opinion on Campbell's *mental* impairments.  Meanwhile, there is no evidence that the State Agency physicians, whose opinions the ALJ substantially credited, had any specialized knowledge in forming its opinions regarding and its evaluation of Campbell's condition.

Although the ALJ stated that he considered the opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527(d), his analysis does not support that conclusion.  Thus, a full assessment of these factors is required, and we thus shall remand the case in order to allow for a complete, accurate assessment of the medical opinions in the record.

### ALJ's Credibility Determination:

The ALJ ruled that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. at 23.)  When an ALJ determines that claimant's medically determinable conditions could reasonably be expected to produce the symptoms, there are seven factors that influence that finding.  20 C.F.R. § 404.1529(c)(3).  These factors include:

(i)     Claimants daily activities;

12

      (ii)     The location, duration, frequency, and intensity of pain or other symptoms;

      (iii)    Precipitating and aggravating factors;

      (iv)    The type, dosage, effectiveness and side effects of any medication you take or have taken to alleviate pain or other symptoms;

      (v)     Treatment, other than medication, received for relief of pain or other symptoms;

      (vi)    Any measure used to relieve pain or other symptoms (e.g. lying flat, standing for 15 to 20 minutes per hour, or sleeping on a board); and

      (vii)   Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

(Id.) Campbell contends that the ALJ's analysis of these seven factors was incomplete, and that had a complete review of these factors been made, it would have shown that her claims concerning the intensity, persistence and limiting effects of her fibromyalgia symptoms were and are credible. (Pl. Br. 21.)

Though the ALJ appears to have considered these seven factors, his analysis of each factor was indeed incomplete and inconsistent with other parts of the record. The ALJ noted that Campbell's daily activities "illustrate a moderate to high level of activity." (R. at 22.) The evidence on which the ALJ relied for this finding included Campbell's ability to drive short distances, to shop using an electronic cart, to correspond with her sister using online instant messaging and to go on a twelve-hour road trip (divided over two, six-hour days). (Id.) The ALJ further noted that Campbell was capable of tending to her own personal hygiene, of assisting with getting her grandchildren ready for school and of completing household chores including "laundry, prepar[ing] meals, and shop[ping] for groceries." (R. at 18.)

While the record supports the ALJ's finding that Campbell is capable of completing these daily activities, the ALJ did not fully consider other portions of the record in concluding that Campbell is capable of completing a "moderate to high level of activity."  As we have previously held, since "objective evidence cannot exist to support impairments [such] as . . . fibromyalgia, it is of the utmost importance that the ALJ fairly consider the subjective evidence of [Plaintiff's] complaints and third party reports." DeCoito v. Astrue, No. 1:07-cv-0330-SEB-TAB, 2008 WL 906164, at *7 (S.D. Ind. Mar. 31, 2008).

At the hearing, Campbell testified that in order to do laundry she must sit on a stool to sort clothes, that she is only capable of doing a few garments at a time, and that, after she starts the washer, she retreats back to the couch to rest.  (R. at 493.)  She further testified that her ability to "prepare meals" is limited to making cold cereal, which she eats sometimes three times a day.  (Id.)  Also Campbell stated that on the one twelve-hour road trip that she made, the journey was split over two days of six hours each day, and her husband had had to make her a bed in the back of the car so she could lie down during the trip.  (Id.)  All of these details were either omitted entirely or only briefly noted in the ALJ's decision.  Furthermore, the ALJ failed to reference any assessment of the third-party statements made by Campbell's husband and daughter.

We agree with Campbell's contention that the ALJ did not fairly consider these third-party reports from Campbell's husband and daughter in assessing Campbell's credibility.  The ALJ referenced the affidavits submitted by Campbell's husband and

14

daughter, but discredited them entirely, apparently based on the fact that both statements noted Campbell's "decreased memory and concentration," which the ALJ maintained was not supported by medical evidence.  (R. at 23.)  In discrediting Campbell's complaint of fatigue, the ALJ stated, "As for the claimant's allegations of fatigue, I considered the affidavits submitted by [Campbell's husband and daughter].  Each noted the claimant's decreased memory and concentration.  However, the objective evidence does not demonstrate any memory impairment." (R. at 23.)  This is the only reference by the ALJ to these third-party statements and seemingly the only consideration given to them.  While we are not authorized to make independent findings, we must conclude that the ALJ erred in discrediting Campbell's *physical fatigue* complaint based on an assertion of *mental impairment* that the ALJ found to be unsubstantiated.  The ALJ further erred by failing to consider the entire content of both third-party statements simply because each statement mentioned a mental impairment.

The relevance of these third-party reports is that they detail limitations on Campbell's activity.  Campbell's husband stated that Campbell's "cooking" no longer consists of "full course meals" and  is limited to "sandwiches, frozen dinners, [and] cereal."  (R. at 119.)  Furthermore, he noted that Campbell can no longer go out to dinner or to a movie, and that she can walk only 200 yards before needing to rest for one hour.  (R. at 84, 122.)  Campbell's daughter also reported that Campbell previously would babysit for her children, but is no longer able to do so.  (R. at 87.)  Moreover, Campbell's daughter stated that Campbell used to engage in scrapbooking as a hobby, but can no

15

longer perform this activity because she cannot sit for any length of time.  (Id.)

Campbell's daughter also reported that she recently had to move back in with her parents

so that she can help care for Campbell.  (Id.)

By omitting this evidence, the ALJ's analysis of Campbell's ability to complete

daily activities and the frequency and intensity of her pain was incomplete.  The ALJ also

failed to include in his assessments the complaints developed in Campbell's testimony

and medical records, and further erred by failing to consider the third-party reports

concerning Campbell's *physical* impairments.  The ALJ cited A. Baker's 2006 psychiatric

evaluation as the only basis for his conclusion that Campbell's mental impairments and

memory loss, as noted in the opinions and reports of Dr. Neucks and Campbell's husband

and daughter, were not credible, even though Dr. Gover's psychiatric evaluation from

2004 indicated Campbell is susceptible to episodes of mental impairment and memory

loss.  (R. at 426-29.)   Even if Campbell were found to have full mental capacity, the ALJ

erred in rejecting these opinions simply because he disagreed with their conclusion of a

mental impairment.

The issue at hand deals with the *physical* impairments brought on by Campbell's

fibromyalgia, which the ALJ described as a severe impairment.  Campbell's *mental*

impairments, which even she does not contend are severe, do not alter the *physical*

findings.  The records and statements of Dr. Neucks and Campbell's husband and

daughter regarding Campbell's physical limitations are all consistent with each other and

Campbell's testimony, and the record lacks well-supported, substantial evidence that

would suggest that these records and statements should not be regarded entirely in determining Campbell's credibility under the first two factors.

The ALJ's analysis of the third evaluative factor relating to Campbell's credibility, to wit, the factors that precipitate and aggravate the symptoms, was also underdeveloped in the evidence here.  The ALJ ruled that Campbell's assertion that her symptoms are aggravated by prolonged sitting or standing is "unsubstantiated in the objective evidence."  (R. at 23.)  However, given the subjective nature of fibromyalgia, a Plaintiff's subjective complaints and evidence should not be rejected out of hand for lack of objective evidence.  Sarchet, 78 F.3d at 306.  Here, Campbell has consistently reported increased pain due to prolonged sitting. (R. at 79, 82, 130, 172.)  This also was noted in Dr. Neucks's opinion (R. at 449) and in Campbell's daughter's third-party report (R. at 87).  It was supported by Campbell's testimony that her husband had to make a bed in the back seat of the car in order for her to make a six-hour road trip on two consecutive days. (R. at 22.)  Moreover, the physical therapy evaluation produced at the time Campbell was discharged indicated that she had decreased tolerance for standing and sitting.  (R. at 395.)  Therefore, the ALJ erred in concluding that the third factor substantiated Campbell's lack of credibility.  Although there is no objective medical evidence to prove that sitting or standing precipitated Campbell's pain, the medical opinions, third-party reports and Campbell's testimony are all consistent in their claims that Campbell's symptoms are indeed precipitated by such activity.

17

The ALJ's analysis of the other four factors relating to Campbell's credibility, although brief, seem to be adequately developed with the exception of factor "xi," which addresses the measures used by the claimant to relieve pain.  The record suggested that Campbell is able to sit, stand and/or walk only for short periods of time, before having to lie down to rest. (R. at 454, 87).  However, in analyzing this factor, the ALJ noted only that Campbell "reportedly occasionally elevates her legs."  (R. at 23.)  Obviously, the ALJ gave little or no consideration to the evidence that Campbell can perform only ambulant or even non-ambulant tasks for a limited period of time before needing to rest, given his finding that she is capable of doing "light work" and can "sit, stand and/or walk for six hours out of an eight hour work day." (R. at 20.)

In evaluating the seven factors which are to inform credibility determinations, the ALJ is required to examine the evidence both favoring the claimant as well as that opposing her.  Blakes v. Barnhart, 331 F.3d 565, 568 (7th Cir. 2003).  Although the ALJ's credibility determination is entitled to deference, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p; see also Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003) (pursuant to SSR 96-7p, the ALJ must "articulate the reasons behind credibility evaluations").  In our case, the ALJ appropriately acknowledges all the applicable factors he was required to consider, but then failed to adequately analyze each

18

of them.  The ALJ's reasoning for discrediting the medical opinion of Dr. Neucks and the

third-party reports on Campbell's physical limitations was accordingly unreasonable and

insufficient and did not justify completely rejecting them from consideration.  The ALJ

failed to provide any reasons to accept the State Agency physicians views as more

credible and worthy of adoption, especially given the fact that the examinations on which

their opinions were based were conducted three years prior to the hearing.

We therefore conclude that the ALJ did not fairly consider all of the subjective

evidence in the record, a conspicuous error given the lack of objective evidence usually

available in a fibromyalgia DIB claim.  The ALJ's assessment of the seven factors to

determine a claimant's credibility under 20 C.F.R. § 404.1529(c)(3) was sufficiently

lacking that an order of remand is the only reasonable response to our judicial review.


*Inconsistencies in ALJ's Opinion:*[3]

Finally, Campbell contends that inconsistencies in the ALJ's opinion further

undermine the substance of his findings.  Campbell argues, first, that the testimony of the

vocational expert ("VE") at the hearing may have been based on inconsistent RFC

assessments.  In the ALJ's decision, he initially opined that Campbell has the RFC to

perform "light work," meaning she can "occasionally lift and carry *twenty* pounds and

---

[3] Since this case must be remanded for a more complete evaluation of the weight
attributable to a treating physician's opinion and a more complete analysis of Campbell's
credibility, the rulings set out in this section are only relevant if the ALJ again arrives at his same
conclusion.

frequently lift and carry ten pounds." (R. at 20)(emphasis added).  Three paragraphs later, however,  the ALJ concluded that Campbell is capable of "occasionally lift[ing] and carry[ing] *ten* pounds and frequently lift[ing] and carry[ing] ten pounds."  (R. at 21.)(emphasis added)  Under  20 C.F.R. § 404.1569(b), "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  Based on the wording of the statute, it appears that the ALJ intended his RFC to include "light work" and the ability to occasionally lift "twenty" pounds, not "ten" pounds as the second reference stated. (R. at 21.)

Finally, Campbell contends that the ALJ's ruling embodies inconsistent restrictions.  The ALJ first held that Campbell should avoid "forceful gripping with either hand." (R. at 20.)  Thereafter, the ALJ determined that she should be restricted from "repeated forceful gripping with either hand."  (R. at 21.)  Having adopted the findings of the VE in forming these restrictions based on the hypothetical questions posed to the VE during the hearing regarding Campbell's ability to "repeatedly forcefully grip," (R. 515-15, 520) we conclude that the ALJ's decision is properly interpreted to restrict "repeated forceful gripping."


***Summary***:

Upon remand, the court directs the ALJ to consider fully the factors for determining the weight of a medical opinion under 20 C.F.R. § 404.1527(d), mindful that if he chooses to discount the opinion of a treating physician, that decision must be based

on medical evidence or authority in the record and may not amount to simply the substituted judgment of the ALJ.  Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000).  Furthermore, upon remand, the ALJ must fully analyze the factors for determining the credibility of the claimant under 20 C.F.R. § 404.1529(c)(3).  Because the ALJ's reasoning underlying his determination of Campbell's credibility was inadequate and unsupported by the record, he should give specific reasons for his credibility finding that are consistent with the record, though clearly he is not required to discuss every factor.  Skarbeck v. Barnhart, 390 F.3d 500, 505 (7th Cir. 2004).  The ALJ's  reasoning for his finding on credibility must be clear enough "so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony."  Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003); See also DeCoito, No. 1:07-cv-0330-SEB-TAB, 2008 WL 906164, at *7 (citing Hickman v. Apfel, 187 F.3d 683, 689 (7th Cir. 1999))(an ALJ must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence . . . [and to enable] us to trace the path of his reason.") Finally, the ALJ should articulate more clearly his assessment of the evidence leading to his decision to assign more weight to the State Agency physician opinions, in light of the third-party statements and Dr. Neucks's opinion.

After properly determining the appropriate weight to give Dr. Neucks's opinion and fairly assessing Campbell's credibility, giving consideration to all the evidence in the record, the ALJ should re-evaluate Campbell's RFC and physical restrictions.  The ALJ

should also then reconsider Campbell's condition under the sequential evaluation process

(20 C.F.R. § 404.1520(g)) to determine whether she qualifies for DIB.

## *Conclusion*

For the reasons discussed in this Entry, this case is hereby <u>REMANDED</u> for

further consideration consistent with the Court's determinations and directions.

IT IS SO ORDERED.

Date: _____06/16/2010_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Timothy J. Vrana
tim@timvrana.com